OPINION
{¶ 1} Defendant-appellant Thomas Eric Garrett appeals from his convictions and sentence for Aggravated Robbery and Felonious Assault. He contends that he was deprived of the effective assistance of trial counsel due to counsel's failure to seek suppression of pre-trial identifications made by the victims. He further contends that the *Page 2 
State did not present evidence sufficient to sustain the convictions and that the convictions are not supported by the weight of the evidence. Finally, he claims that a verbal exchange between one of the State's witnesses and a juror, during a sidebar conference, deprived him of a fair trial.
 {¶ 2} We conclude that Garrett has failed to demonstrate his claim of ineffective assistance of counsel, because the record does not show that the pre-trial identifications were tainted. We also conclude that his claims regarding the sufficiency and weight of the evidence are not borne out by the record. Finally, we conclude that Garrett's claim that he was deprived of a fair trial lacks merit. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} In October, 2006, Robert Sutton was installing a tile floor at a restaurant in Dayton. His girlfriend, Aimee Kroener was with him. The restaurant was closed to business. At some point, Sutton heard someone enter. Sutton turned to see a man with a gun approaching him. There were also two other men and a woman with the gunman.
 {¶ 4} The gunman ordered Sutton to give him his money. Sutton pulled fifty dollars from his pocket and gave it to the gunman. The gunman indicated that he thought Sutton had more money. Sutton then pulled out his wallet and stated, "I don't have a credit card or a check card or anything. I'm just as broke as you. I don't have any money until I get paid off this job." The gunman used his free hand to slap the wallet out of Sutton's grip. The gunman then placed the gun against Sutton's head. *Page 3 
Sutton said, "please don't shoot me," to which the gunman replied, "I ain't going to shoot you, you know, unless you do something stupid." The other three individuals then told the gunman to get Sutton's keys. At first Sutton refused, but he then handed over the keys, which the gunman tossed to the other individuals. Those people then entered the truck and started its engine. The gunman struck Sutton on the side of the head with the gun, and then left the scene with the others in Sutton's truck.
 {¶ 5} Sutton ran across the street and found a telephone with which to call 911. When the police arrived, Sutton and Kroener identified the gunman as a "black man" wearing a white t-shirt. They further stated that the gunman was approximately six feet, four inches tall and that he weighed approximately one hundred and eighty pounds. Sutton was treated at a hospital for the injury to his head, which was cut and had a large knot.
 {¶ 6} Subsequently, in March of 2007, the Dayton Police Department received information from a confidential informant that a man wanted to sell a truck that may have been stolen. Dayton Police Detective William Knight was working as an undercover officer and was assigned to go with the confidential informant to meet the seller. Knight met with a black man, who identified himself as Eric (Garrett's middle name), and attempted to sell him a red truck. The truck was identified as Sutton's.
 {¶ 7} Sutton and Kroener were then contacted by Dayton Police Detective Ritchey and asked to view a photo array. Ritchey took Kroener into a separate room where she was shown a photo array. Kroener immediately, and "without hesitation," identified Garrett as the gunman. Thereafter, Ritchey took Sutton into a room where she showed him a photo array. He identified Garrett "without hesitation." He also *Page 4 
identified his truck. Sutton and Kroener had no opportunity to talk to one another in between the time they were shown the arrays. Although Garrett contends that Kroener was obviously emotionally upset when she returned to the lobby from having identified Garrett's photograph, thereby indicating to Sutton that Kroener had made a positive identification, Ritchey testified that she "calmed her down" before returning her to the lobby.
 {¶ 8} Garret was indicted on one count of Aggravated Robbery and one count of Felonious Assault. Both counts carried firearm specifications. Following a jury trial, Garrett was found guilty of both offenses, and was sentenced accordingly. From his convictions and sentence, Garrett appeals.
 II {¶ 9} Garrett's First Assignment of Error states as follows:
 {¶ 10} "APPELLANT GARRETT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO FILE A PRETRIAL MOTION TO SUPPRESS IDENTIFICATION EVIDENCE."
 {¶ 11} Garrett contends that trial counsel should have sought the suppression of the pre-trial identifications made by Sutton and Kroener, and that the failure to do so deprived him of his right to effective assistance of counsel. In support, he contends that the pre-trial identifications made by Sutton and Kroener were unreliable and were tainted by an unduly suggestive photo array.
 {¶ 12} We turn first to the claim that the photo array was unduly suggestive. This *Page 5 
argument appears to be directed solely at Sutton's identification. Garrett argues that Sutton was improperly informed by Detective Ritchey that "a photograph of the person who had [the] truck appeared in the photo spread."
 {¶ 13} To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was so suggestive as to create a substantial likelihood of misidentification, and that the identification itself was unreliable under the totality of the circumstances. State v. Poindexter, Montgomery App. No. 21036,2007-Ohio-3461, ¶ 11. If a defendant shows that an identification procedure was unduly suggestive, the trial court must then "consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." State v.Wills (1997), 120 Ohio App.3d 320, 324. "If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." Id.
 {¶ 14} We first address the photo array itself. We have reviewed the actual arrays and note that each of the six individuals in the array is an African-American with braided hair, mustache and goatee. Five of the six individuals have similar skin tone; the one with slightly darker skin is not Garrett. The backgrounds in the photos appear identical. Garrett's clothing in the array is similar to the clothing of the others. In short, there is nothing to suggest that this array is unduly suggestive by itself.
 {¶ 15} We now turn to the claim that the actions of Detective Ritchey rendered the array unduly suggestive by telling Sutton, prior to his identification, that the perpetrator was included in the array. We conclude that while the record shows that *Page 6 
Detective Ritchey, at most, informed Sutton and Kroener that they "may have found" the perpetrator, it does not support the claim that she told them that the perpetrator was included in the photo array prior to their identification. Further, it is clear that Ritchey properly followed appropriate procedures and issued all necessary instructions when conducting the identification.
 {¶ 16} Next, Garrett argues that the pre-trial identifications made by Sutton and Kroener were unreliable. Garrett argues that the evidence suggests that neither Sutton or Kroener had sufficient opportunity to view the perpetrator. He cites excerpts from the trial transcript that he claims indicate that Sutton tried not to look at the perpetrator and that the gun obstructed his view of the perpetrator. He also cites the fact that Kroener did not see the perpetrator until the perpetrator had the gun to Sutton's head and that she then buried her face in her palms. He further claims that both Sutton and Kroener were able to give only vague descriptions of the perpetrator to the police at the scene.
 {¶ 17} The factors to be considered when determining whether the circumstances show the reliability of the identification are: (1) whether the witness had the opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty expressed by the witness at the time of the identification; and (5) the length of time between the crime and the confrontation.State v. McCoy, Franklin App. No. 07AP-769, 2008-Ohio-3293, ¶ 11.
 {¶ 18} Based upon our review of the record, we find these claims lack merit. It is clear that both Sutton and Kroener had ample time to observe Garrett over the course of the incident, which lasted three to five minutes. Garrett did not have on a mask, nor was *Page 7 
his face hidden in any way. The lighting at the scene was bright. Garrett stood close enough to Sutton to be able to touch him with the gun. Kroener was only two feet away from Garrett during the incident. Both Sutton and Kroener identified, "without hesitation," Garrett as the perpetrator both during the pre-trial identification as well as during trial.
 {¶ 19} After reviewing the totality of the circumstances, we conclude that the pre-trial identifications were sufficiently reliable to support Garrett's conviction. Based on our findings above, we find nothing in this record to support a claim that a motion to suppress would have been granted. Thus, we cannot say that counsel was ineffective for failing to move to suppress. The First Assignment of Error is overruled.
 III {¶ 20} Garrett's Second Assignment of Error is as follows:
 {¶ 21} "APPELLANT'S CONVICTIONS WERE AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 22} Garrett contends that the State failed to present evidence sufficient to sustain his convictions. He further contends that the jury's verdict is against the manifest weight of the evidence. In support, he cites the arguments made in Part II, above, regarding the claim of improper pre-trial identifications.
 {¶ 23} When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. State v.Dennis, 79 Ohio St.3d 421, 430, 1997-Ohio-372. However, when a *Page 8 
conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Thompkins, 78 Ohio St.3d 380, 387. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. State v.Martin (1983), 20 Ohio App.3d, 172, 175.
 {¶ 24} As stated above, Garrett's argument hinges on the claim that the pre-trial identification was flawed. Given our disposition of the First Assignment of Error in Part II, above, we find that this argument lacks merit.
 {¶ 25} Furthermore, we have reviewed the evidence presented at trial, and find that the State presented evidence on every element of the offenses for which Garrett was convicted and we cannot find that the jury lost its way in finding this evidence credible. Accordingly, the Second Assignment of Error is overruled.
 IV {¶ 26} Garrett's Third Assignment of Error provides:
 {¶ 27} "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR *Page 9 
TRIAL THROUGH A WITNESSES [SIC] COMMENTS TO A JUROR."
 {¶ 28} Garrett contends that an exchange between a juror and a witness for the State deprived him of a fair trial. Specifically, he complains that Dayton Police Detective, William Knight, was on the witness stand during a sidebar when he "expressed his sorrow to the jurors that they were having to remain late." One juror responded that "it was okay." Garrett contends that this conversation "might well have placed the Prosecution and Detective Knight's testimony in a more favorable light before the jury because of the friendly, apologetic contact and interchange."
 {¶ 29} When this matter was brought to the attention of the trial court, the trial court conducted the following examination of both Detective Knight and the juror:
 {¶ 30} "THE COURT: It has come to the Court's attention that during an earlier sidebar during Detective Knight's testimony that the detective was having some conversation with juror number seven. And Detective, are you able to tell us the nature of that conversation?
 {¶ 31} "DETECTIVE KNIGHT: Absolutely. I spoke to the court reporter. I said, geez, you guys are here late today. She said, yeah, we got a late start. And the girl [evidently the juror] was nodding her head, and I said, sorry guys, you have to stay late. That was it.
 {¶ 32} "THE COURT: Okay. Anything further then?
 {¶ 33} "DETECTIVE KNIGHT: That was my exact words.
 {¶ 34} "THE COURT: Counsel have any questions in light of this?
 {¶ 35} "MR. PENTECOST: Was there any response to that from the juror? Did she make any comments to you? *Page 10 
 {¶ 36} "DETECTIVE KNIGHT: She just went um, that's it.
 {¶ 37} "THE COURT: Anything further?
 {¶ 38} " * * *
 {¶ 39} "THE COURT: We will now ask [the Bailiff] to bring [the juror] in.
 {¶ 40} " * * *
 {¶ 41} "THE COURT: It was brought to the Court's attention that when we had a sidebar a while ago that there was a brief, apparently brief conversation — some conversation between you and this last witness. It's just that we try to maintain the integrity of the system is that if there's a — remember the attorneys asked you if you knew any of the witnesses, that's what we wanted to make sure of mainly. Can you tell us about that?
 {¶ 42} "[THE JUROR]: Yeah. He just said — he apologized that we had to stay so long. I said oh, that was okay.
 {¶ 43} "THE COURT: Anything else?
 {¶ 44} "[THE JUROR]: No.
 {¶ 45} "THE COURT: Any other questions from counsel about that?"
 {¶ 46} "THE STATE: No, Your Honor.
 {¶ 47} "MR. PENTECOST: That was the only discussion that was had, nothing about anything else?
 {¶ 48} "[THE JUROR]: That's all was said."
 {¶ 49} Garrett failed to preserve this issue, for whatever it might have been worth, for appellate review by requesting a mistrial or other relief, such as dismissal of the juror. When a defendant does not make a request to remedy the alleged juror misconduct at *Page 11 
trial, the defendant waives all but plain error. State v. McKnight,107 Ohio St. 3d 101, 2005-Ohio-6046, ¶ 185. Garrett does not argue that the trial court's failure to excuse the juror or declare a mistrial was plain error, and given the innocuous nature of the exchange, without any apparent resulting prejudice, we cannot say that the trial court's decision rises to the level of plain error. Accordingly, the Third Assignment of Error is overruled.
 V {¶ 50} All of Garrett's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and WALTERS, JJ., concur.
(Hon. Sumner E. Walters, retired from the Third District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1